

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MIDWEST HEARTH PRODUCTS, INC., a South Dakota Corporation, f/k/a Midwest Energy System, Inc., and RAY WILCOX, <br><br>Plaintiffs, <br><br>-vs- <br><br>EVEN TEMP, INC., a Nebraska Corporation, <br><br>Defendant. | CIV 08-4014 <br><br><br><br><br><br><br>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs, Midwest Hearth Products, Inc ("Midwest Hearth") and its owner Ray Wilcox ("Wilcox") have sued Defendant, Even Temp, Inc. ("Even Temp"), for commissions allegedly due to it pursuant the Manufacturer's Representative Agreement ("Agreement") entered into between the two parties on January 11, 2006. Midwest Hearth alleges the following causes of action in its Complaint: (1) breach of implied covenant of good faith and fair dealing; (2) breach of implied contract; (3) unjust enrichment; and (4) recoupment.

Defendant has moved for summary judgment on all of the claims alleged by Plaintiffs. In their Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiffs conceded to dismissal of the breach of implied contract and recoupment counts. Plaintiffs' resistance to summary judgment is therefore limited to their claims for breach of implied covenant of good faith and fair dealing and for unjust enrichment.

A pretrial hearing was held on Even Temp's Motion for Summary Judgment on Monday,

1

March 30, 2009, at 10:00 a.m. in Courtroom 1 before the Honorable Lawrence L. Piersol. After hearing oral argument by counsel for both parties, the Court ruled that summary judgment be granted on Midwest Hearth's claims for breach of implied covenant of good faith and fair dealing and that summary judgment be denied as to Midwest Hearth's claims for unjust enrichment.

## BACKGROUND

Plaintiffs in this action are Midwest Hearth Products, Inc. ("Midwest Hearth") and its owner Ray Wilcox ("Wilcox"). Midwest Hearth was a wholesale business and an independent representative for Defendant, Even Temp. Inc. ("Even Temp"), a Nebraska corporation that distributed heating products such as fuel-burning stoves and furnaces. Midwest Hearth had been an independent representative for Even Temp's products since approximately 2003. Midwest Hearth also sold hearth products for other companies which were not considered to be in direct competition with Even Temp's products.

**2005-06 Product Shortages**

In late 2005 and early 2006, demand for the most popular product that Even Temp distributed nationwide, the St. Croix pellet and corn burning stoves ('corn burning stoves"), substantially exceeded the available products. A moratorium on accepting new orders was established by the manufacturer effective January 3, 2006, eight days prior to the time Midwest Hearth and Even Temp entered into their most recent Manufacturer's Representative Agreement. In a letter to Midwest Hearth detailing the moratorium, Even Temp indicated that it had doubled sales and production for three straight years and that the following year was "more than sold out."

**Contract**

On January 11, 2006, Midwest Hearth and Even Temp entered into the most recent Manufacturer's Representative Agreement that governed their contractual relationship. This Agreement was identical to the parties' prior agreement with the exception that commissions were lower on Jotul, a product unrelated to this action. Pursuant to the contract, Even Temp appointed

2

Midwest Hearth "as the Company's exclusive representative within the territory and on terms and conditions hereof for the solicitation and acceptance of orders for products and services hereinafter described." The sales territory was South Dakota (for all products except ICC), the city of Luverne, Minnesota, and the portion of Iowa west of Highway 169. The Agreement specifically imposed the following duties upon Midwest Hearth:

> The Representative shall solicit and take orders in the territory for the purchase of the above referenced products and services specified by the Company, from time to time, in the Company's price lists with special quotations and on the standard terms and conditions of quotation or sales specified by the Company. All orders solicited and taken by the Representative shall be subject to acceptance and confirmation in writing by the duly authorized agent of the Company. Decisions regarding a customer's credit and all matters related to billing and shipments to customers shall be made only by the Company . . . .

Regarding Even Temp's obligation to accept orders taken by Midwest Hearth, the contract provided as follows:

> Company reserves the right, in its sole discretion, to decline to accept any orders solicited or taken by Representative, and to discontinue the sale of any item of product or services, <u>and to allocate the availability of products or services during periods of shortages without incurring any liability to Representative for the payment of commissions hereunder</u>. The Company may cancel any order, either in whole or in part, without liability to Representative at any time after acceptance by Company. Delivery dates by Company shall be approximates only.

Regarding the commissions that were to be paid by Even Temp to Midwest Hearth, the contract provided as follows:

> Unless specifically agreed otherwise, <u>Company will pay and Representative shall be deemed to have earned a commission on all products shipped and invoiced to customers in above described territory based on the net selling price of the products or services sold within the territory by the Representative</u>. Net selling price is defined as gross invoice amounts rendered to customers less any taxes, freight, etc. Returned product or price adjustments made for previously invoiced products will be deducted from commissions. Unless otherwise specified herein, if any orders are

3

solicited and taken by the Company directly from customers in the territory, the Representative shall be entitled to a commission on the sale in the same manner as if Representative had solicited and taken the order.

The contract between the parties was terminable at will by either party for any reason, upon 30 days notice to the other. In regards to termination, the agreement provided:

> Termination shall be without prejudice to the rights and obligations of the party hereto that have vested prior to the effective date of termination, <u>except that after termination, Company shall pay Representative all commissions earned by Representative during the duration of this Agreement without regard to when payments from the customers may be received by the Company</u>.

Finally, the contract provided that it superceded any and all previous agreements and understandings, that any amendments would not be effective unless in writing and properly executed, that its contractual terms constituted the entire and exclusive agreement between the parties, and that "[t]his Agreement and any disputes relating thereto, shall be construed under the laws of the state of Nebraska."

**Midwest's Hearth Reallocating Orders**

After receiving notice of the moratorium on the corn burning stoves, Midwest Hearth sent a letter on January 14, 2006, to all of the dealers in its territory explaining the need to reallocate product and the proper procedures to be followed.

**Even Temp Offers Wilcox Employment Position**

In approximately mid-January, at their representative meeting, Even Temp met with Wilcox of Midwest Hearth and offered him a full-time position as Even Temp's representative for Midwest Hearth's existing territory. The annual earning potential for this position, including salary and commission, was $136,000. (Doc. 20-5.) At that time, Midwest Hearth was one of two independent representatives contracting with Even Temp. All other product representatives of Even Temp at the time were employees rather than independent representatives.

**Wilcox Declines Offer of Employment**

On January 30, 2006, Wilcox wrote to Even Temp declining its offer of employment. In his letter, Wilcox noted that he would receive more compensation under the current representative agreement than under the salary and commission structure reflected in the offer of employment. At the time that Wilcox received the offer of employment, assuming Wilcox's existing allocated orders would eventually be shipped and invoiced during the remaining 30 days of his Agreement, he stood to earn approximately $300,000 in commissions. Wilcox understood at the time that Midwest Hearth's current contract could be terminated by Even Temp with thirty days notice. In his letter, Wilcox expressed his hope that the current contract would not be canceled until the end of 2006. Specifically, Wilcox wrote, in part:

> . . . With that said I am a businessman and fully understand that you can have someone else on the payroll for considerably less money. I also understand there is a different perception from the customer's standpoint with regards to a bonified [sic] Even Temp employee vs an independent rep. As well as the company's desire to have more control and cost effectiveness that an employee would bring.
>
> I am very happy with the present situation as it stands, however, with your goals in mind, perhaps it would be best and preferable to me that we carry out the present contract through 2006, with the goal being to have a new employee in position by the 4th quarter. At which time, the new employee and I could make the rounds together and prepare for a smooth transition.

**Even Temp Exercise Contractual Right to Terminate Contract With 30 Days Notice**

On January 31, 2006, approximately a month after Even Temp issued its moratorium on the corn burning stoves and one day after Wilcox declined Even Temp's employment offer, Even Temp exercise its contractual right to terminate the Agreement with Midwest Hearth. Even Temp wrote:

> Thank you for your response regarding the South Dakota territory. We respect your position in regards to remaining as an independent representative.
>
> You understand our reasons for wanting a company person and we wanted to create a mutually beneficial situation for the long term with you as our first choice. While we are sorry of your decision we need to inform you of our intent to secure a company representative for this territory. Effective March 1, 2006, your

representative Agreement with Even Temp, Inc. will expire as per Section 14 of Representative Agreement.

Even Temp's letter also outlined several issued that needed to be addressed and obligations that Wilcox should fulfill during his last thirty days. Specifically Even Temp wrote the following:

> There are some open items that must be addressed during your next 30 days of service listed below but not limited to:
> (a)     Allocations of orders for at least the next 30 days.
> (b)     Transitioning the dealers.
> (c)     All pertinent information as defined in Section 14 of the agreement.
> (d)     Commissions due.
> (e)     All other items deemed necessary during the course of the next 30 days.

Even Temp's January 31, 2006, letter did not indicate that Wilcox would not be paid to address the open items listed in its letter and the company's Chief Financial Officer could not recall whether anyone from Even Temp explained to Wilcox that Even Temp did not intend to pay Wilcox. The letter also did not mention anything regarding Even Temp's ability or inability to ship product ordered by dealers in Wilcox's territory within the final thirty days of the Agreement.

After receiving the letter terminating employment, Wilcox continued to reallocate orders for the corn burning stoves on account of the production moratorium that had be instituted on January 3, 2006. In order to complete the reallocation process prior to the expiration of his contract, Wilcox testified that he had to "put in 20 hours a day for the next thirty days to get this done and I got it done like midnight." (Wilcox Dep. 45:11-13.) In addition to reallocation of product and transitioning the dealers, Wilcox trained his replacement at Even Temp's oral request.

After Midwest Hearth received notice that its contract with Even Temp would be terminated in thirty days, dealers within Midwest Hearth's territory continued to place orders. Even Temp paid Midwest Hearth for all orders for which product was available to be invoiced and shipped during the duration of the Agreement, but did not pay commissions to Midwest Hearth for product that was invoiced and shipped after the contract expired, regardless of when it was ordered.

On April 5, 2006, Midwest Hearth wrote to Even Temp requesting to be paid commissions for products that were ordered from Even Temp prior to the termination of the Agreement, but not invoiced or shipped until after the termination of the Agreement.

Even Temp, however, contends that no such commissions were earned and are not owed to Midwest Hearth under the express terms of the contract because no product from those orders placed by dealers with Even Temp was invoiced or shipped during the duration of the Agreement with Midwest Hearth. In fact, commissions for product invoiced and shipped after March 1, 2006, for that territory were paid to the employee representative responsible for that territory after that date.

After Even Temp declined to remit payment to Midwest Hearth for the commissions invoiced and shipped after the expiration of the contract, Midwest Hearth filed the present action alleging four counts: (1) breach of implied covenant of good faith and fair dealing; (2) breach of implied contract; (3) unjust enrichment; and (4) recoupment. In its Memorandum in Opposition to Even Temp's Motion for Summary Judgment, Doc. 22, Midwest Hearth conceded to dismissal of the breach of implied contract and recoupment counts. Midwest Hearth's resistance to summary judgment is therefore limited to its claims for breach of implied covenant of good faith and fair dealing and for unjust enrichment.

## DISCUSSION

Per the terms of the Agreement, all provisions thereunder are to be construed under the laws of the state of Nebraska.

### I. Count I: Breach of Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract." *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 400 (Neb. 2003).

"The question of a party's good faith in the performance of a contract is a question of fact." *Id.* at 396-97 (citation omitted).

The scope of an implied covenant of good faith and fair dealing is defined by: 1) the justifiable expectations of the parties and 2) the express covenants or promises of the contract. *Id.* at 400. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party." *Id.*

Midwest Hearth appears to allege in its brief in resistance to Even Temp's motion for summary judgment that there is an implied covenant of good faith and fair dealing in the Agreement that Even Temp would ship and invoice products before the expiration of their Agreement for all the sales made by Midwest Hearth during that time. (Doc. 22 at 11-12.)

The Court finds that there is an implied covenant in the Agreement that Even Temp would allocate and ship and invoice products with reasonable diligence. This is not contrary to either the express terms or purposes of the Agreement, and in fact, is a necessary implication. In *George v. Jones*, 95 N.W.2d 609, 616-17 (Neb. 1959), the Nebraska Supreme Court stated:

> Where a lessee covenants expressly to pay the lessor a certain royalty on all the minerals or products that may be mined under a mining lease, even though there is no express covenant that the lessee shall work the mine continuously, or in any particular way, or at all, there is manifestly an implied covenant on his part that he will work it as such mines are usually worked, with ordinary diligence, under the surrounding circumstances; not, indeed, simply for his own advantage and profit, but as well to the end that the lessor may secure the actual consideration for the lease. Such a covenant arises by necessary implication.

As in *George*, the Court finds that there is an implied covenant on the part of Even Temp that it will ship and invoice products with ordinary diligence, given the surrounding circumstances, so that Midwest Hearth may secure actual consideration for their Agreement. The contract clearly states that Midwest Hearth will be paid commissions only on products that are invoiced and shipped during the duration of the Agreement and a failure by Even Temp to do so with reasonable diligence

8

constitutes breach of implied covenant of good faith and fair dealing.

In determining whether Even Temp breached an implied covenant to ship and invoice the products with reasonable diligence, the Court must determine whether it was a "justified expectation" by Midwest Hearth that all products sold during the term of the Agreement would also be shipped and invoiced during that time. The Court finds that by construing all reasonable inferences of the facts in favor of Midwest Hearth, that no reasonable jury could find that such an expectation is justified. In the Fall of 2006, prior to receiving the full-time employment offer by Even Temp and receiving the notice of termination, Midwest Hearth was well aware of the wait dealers would have to endure before receiving shipments of Even Temp's most popular product. Wilcox explicitly acknowledged in his deposition that given the product shortage, "[b]y the fourth week in October [2005] if a dealer ordered a stove, he wouldn't get it any time in 2006." (Wilcox Dep. 20:5-6.) The moratorium letter issued in early January 2006 confirmed this product shortage by stating that the following year was "more than sold out." Moreover, Wilcox testified that some time in January 2006, although it is not clear exactly when, he knew the number of units he had been allocated on account of the shortage and "knew in what month I was going to get [the allocated units] and what units I was getting each month." (Wilcox Dep. 46:11-18.) Accordingly, the Court finds that no reasonable jury could conclude that Even Temp's failure to ship and invoice all the product orders received by Even Temp in January and February 2006 constituted a breach of an implied covenant of good faith and fair dealing.

The shipping statistics cited in the Neal Affidavit also support the Court's conclusion that Even Temp shipped and invoiced products to Midwest Hearth's dealers with reasonable diligence. In 2005, when Midwest Hearth was working as Even Temp's representative and building their territory, shipments to customers of Midwest Hearth represented approximately fifteen percent of Even Temp's total corn burning stove sales nationwide. In February 2006, during the last 30 days of the Agreement, shipments of corn burning stoves to customers of Midwest Hearth accounted for 14.5% of Even Temp's shipments nationwide.

For these reasons, the Court grants Even Temp's Motion for Summary Judgment as it pertains to Midwest Hearth's claim for breach of implied covenant of good faith and fair dealing.

## II. Count III: Unjust Enrichment

Midwest Hearth claims that it is owed money under the principles of unjust enrichment for 1) reallocating orders of the corn burning stoves; 2) transitioning the dealers and 3) training the replacement representative[1] which it performed in accordance with the requests made by Even Temp in its January 31, 2006, termination letter.

"[T]he principle of [unjust enrichment] is a contract implied in law theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another." *Sorenson v. Dager*, 601 N.W.2d 564, 572 (Neb. Ct. App. 1999) (citation omitted). "The issue of unjust enrichment is a question of fact. Where benefits have been received and retained under circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the recipient to pay the reasonable value of the services." *Id.*

"The doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties." *Washa v. Miller*, 546 N.W.2d 813, 818-19 (Neb. 1996). "The doctrine does not operate to rescue a party from the consequences of a bad bargain. In other words, the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.* (internal citations omitted).

---

[1] Although Even Temp did not specifically request in the letter that Midwest Hearth train its replacement, Even Temp did request that Midwest Hearth perform "all other items deemed necessary." Additionally, Midwest Hearth alleges in its Statement of Material Facts at ¶ 28 that Even Temp requested that it train the replacement representative.

10

Even Temp contends that under *Washa v. Miller*, 546 N.W.2d at 818-19, Even Temp cannot plead and prove the existence of an express contract and then prove and recover under the doctrines of unjust enrichment and quasi-contract because the express contract precludes the existence of a quasi-contract. However, it is clear that under Nebraska law, a quasi-contract on "a point not covered by an express contract is not superseded by the express contract, and if [both] arise out of the same transaction, they may be pleaded and tried together." *Prof'l Recruiters, Inc. v. Oliver*, 456 N.W.2d 103, 106 (Neb. 1990) (quoting *Associated Wrecking v. Wiekhorst Bros.*, 424 N.W.2d 343, 350 (1988)). This principle has been applied when one party performs extra work not covered by the express contract. *Associated Wrecking*, 424 N.W.2d at 348-49.

Even Temp also contends that the duties performed by Midwest Hearth for which the company alleges Even Temp was unjustly enriched are not extra work outside the scope of the Agreement, but rather fell within the scope of duties prescribed in the Agreement. While the Agreement defines Midwest Hearth's duties as "[t]he Representative shall solicit and take orders in the territory for the purchase of the above referenced products and services specified by the Company, from time to time, in the Company's price lists with special quotations and on the standard terms and conditions of quotation or sales specified by the Company," it appears that Even Temp contends that the course of dealing has defined that actual scope of the relationship. Wilcox testified in his deposition that his job was to "support the dealer, to educate him on new products and installation techniques" (Wilcox Dep. 16:11-14), and wine and dine dealers and go out and help them with a problem unit they were having or provide phone support. (Wilcox Dep. 12:1-4.) Furthermore, Wilcox testified that he was rarely even involved with soliciting or taking orders as detailed in the Agreement since dealers would typically fax orders to Even Temp directly. Wilcox would learn of these orders only after the sale was made and Even Temp has sent him a copy of the invoice. (Wilcox Dep 16:14-18.)

The Court denies Even Temp's motion for summary judgment as it pertains to Midwest Hearth's claim for unjust enrichment. The Court finds that there are material facts in dispute as to

the extent Wilcox's job duties and obligations had been modified through his course of dealings with Even Temp and through the correspondence between the parties.

For the foregoing reasons, it is hereby ORDERED that Even Temp's Motion for Summary Judgment, Doc. 19, be GRANTED IN PART AND DENIED IN PART. Count I of Midwest Hearth's Complaint alleging breach of implied covenant of good faith and fair dealing is dismissed with prejudice. Count III of Midwest Hearth's Complaint alleging unjust enrichment will be heard by a jury unless, as discussed in the pretrial hearing, the Court is informed by the parties that Nebraska law does not permit claims for unjust enrichment to be brought before a jury but instead must be tried to the Court. A jury trial in this matter is scheduled to begin on Tuesday, April 28, 2009, at 9:30 a.m. in Courtroom 1 before the Honorable Lawrence L. Piersol. It is furthered ORDERED that parties shall file a short memorandum detailing the damages that may be recoverable under Nebras ka law in an unjust enrichment claim along with proposed instructions containing supporting authorities by the close of business on Monday, April 13, 2009.

Dated this 7th day of April, 2009.

BY THE COURT:

*[signature]*
Lawrence L. Piersol
United States District Court Judge

ATTEST:
JOSEPH HAAS, CLERK

BY *[signature: Colleen Schulte]*
(SEAL)    DEPUTY